IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| EUJENIO ANDRADE, | § | |
| | § | |
| *Plaintiff,* | § | CIVIL ACTION NO. 7:24-CV-26 |
| | § | |
| v. | § | |
| | § | |
| STATE FARM LLOYDS, | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

### PARTIES

1.    Plaintiff, Eujenio Andrade, (hereinafter referred to as the "insured" or plaintiff) is an individual and a citizen of the State of Texas.

2.    Defendant, State Farm Lloyds, (hereinafter referred to as "State Farm" or "defendant") is a corporation that is incorporated under the laws of the State of Illinois. Defendant has its principal place of business in the state of Illinois.  Defendant may be served with process by serving its registered agent, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.

### JURISDICTION

3.    The Court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because plaintiff and defendant are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.

### VENUE

4.    Venue is proper in this district under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district.

5.     All conditions precedent has been performed or have occurred.

6.     The plaintiff is the owner of a homeowner insurance policy, policy number 83GTM8574, issued by State Farm (hereinafter referred to as the "policy").

7.     The plaintiff owns the insured property that is specifically located at 5111 N. 24th Lane, McAllen, Texas 78504 (hereinafter referred to as the "property").

8.     Defendant or its agent sold the policy insuring the property to plaintiff.

9.     On or about April 28, 2023, plaintiff's property sustained damage from a storm.  Plaintiff submitted a claim to State Farm against the policy for the damage.

10.     Plaintiff submitted a claim to State Farm against the policy for damage caused to the property because of a storm. The insured asked State Farm to cover the cost of repairs to the property pursuant to the policy and any other available coverages under the policy. State Farm assigned claim number 5349B088L to the plaintiff's claim.

11.     After the plaintiff reported the loss, State Farm inspected the property in question.  State Farm performed an insufficient and unreasonable investigation of the property.  The storm caused significant damage to the roof of the property. The extensive damage to the roof called for a complete replacement of the roof, shingles, gutters, and fence surrounding the property.  State Farm failed to inform the insured of the insured's coverages and informed the insured that the policy did not cover the damage. As a result of State Farm's unreasonable investigation, the insured was wrongly denied the full cost to repair all the covered damage.

12.     State Farm failed to properly adjust the claim and State Farm has denied at least a portion of the claim without an adequate investigation, even though the policy provided coverage for losses

such as those suffered by the plaintiff. Furthermore, State Farm underpaid portions of the plaintiff's claim by not providing full coverage for the damages sustained by the plaintiff, as well as under-scoping the damages during its investigation.

13.    In addition, State Farm denied contractor overhead and profit expenses associated with the proper repair of the property. State Farm has displayed a pattern and practice of denying payment of these expenses to any of its insureds.

14.    State Farm failed to document the damage to the dwelling.  State Farm conducted an insufficient inspection and prematurely closed the plaintiff's claim. At the time of the investigation, premature closing of claims was part of a pattern and practice of claims handling by State Farm.

15.    State Farm failed to properly qualify, train, and supervise its employees and agents to whom State Farm entrusted the handling of various portions of insured's claim. State Farm, its agents, and employees failed to follow procedures and properly execute their duties as promulgated in State Farm's system of administering and handling the insured's claim. State Farm's actions, as detailed in this complaint, caused a system failure that resulted in State Farm's violation of the Texas Insurance Code, Texas Deceptive Trade Practices Act, as well as the violation of a host of Texas common law principles.  These violations resulted in State Farm's denial to the insured of the full protection and benefits of these laws and the policy benefits to which the insured was entitled.

16.    To date, State Farm continues to delay in the payment for the damages to the property. As such, the insured's claim(s) remain unpaid, and the insured still has not been able to properly repair the property.

## STATE FARM'S USE OF LITIGATION

17.    "When an insured buys insurance, she buys insurance – not a lot of vexatious, time-consuming, expensive litigation with her insurer."  As stated previously, insurance companies account for future claim payouts, claim expenses, and a reasonable profit in setting premium rates for their books of business.  However, insurance companies have hired consulting companies, such as McKinsey & Company, to implement plans, strategies, policies, and processes to transform insurance companies' claim departments into profit centers.  McKinsey & Company is the most powerful consulting company in the world and has "the greatest global reach of any advisor to management in the world."  It serves as the chief advisor and key architect of strategic thinking for "147 of the world's 200 largest corporations, including 80 of the top 120 financial-services firms, 9 of the 11 largest chemical companies, and 15 of the 22 biggest health-care and pharmaceutical concerns."  McKinsey's clients pay from $10 million to $60 million per year for advice on how to manage their business operations to increase profitability. McKinsey & Company acted as a leader in formulating a new insurance strategy to convert insurance claim departments into efficient profit centers.  Many of the world's largest insurers hired McKinsey for this purpose.  However, although every insurance company did not hire McKinsey directly and did not have a direct relationship with McKinsey, McKinsey's policies influenced the operations of the insurance industry as a whole because of the extraordinary results McKinsey achieved for the insurance companies that did retain McKinsey directly for its consulting services.  McKinsey has already worked on several projects for insurance companies seeking to increase profits.  These include Allstate, Hartford, United Services Automobile Association (USAA), and possibly Nationwide, and Liberty Mutual as well.  USAA invited interested members of the insurance community to its home office in San Antonio for open discussions about McKinsey's redesign of its claim system.

USAA credited McKinsey with "saving" the company and openly shared information about McKinsey's creation of USAA's new claims handling system.

18.   In essence, the McKinsey strategy calls for State Farm to take measures to reach various goals as part of its design to convert the insurance claims handling department into an efficient profit center.   A major goal of this strategy is to shift any advantage away from the insureds and plaintiff's attorneys.   As the first step in the process, State Farm reduces attorney representation levels by improving the initial customer service experience for its insureds.   Specifically, State Farm makes early contact with the insureds following a claim, promise fair treatment, and promise prompt payment.   During the claim investigation, State Farm aggressively investigates only the facts which defeat the claim once attorney representation begins.   State Farm then makes "firm" [take-it-or-leave-it] settlement offers with no real negotiation.   If the insured refuses to accept the "firm" offer, then State Farm aggressively litigates the claim to verdict without negotiation or compromise, employing hard-nosed tactics designed to make litigation so lengthy and expensive that policyholders and attorneys will yield to the insurer's claim values.   Essentially, policyholders who want "prompt" payment – meaning they are willing to give State Farm a cut from their share of the claim trust fund – get "Good Hands" treatment; while policyholders who want "fair" payment – meaning they refuse to give State Farm a cut from their share of the claim trust fund – get "Boxing Gloves" treatment.   No policyholder, however, will get both prompt *and* fair payment of a claim.

19.   State Farm implemented a litigation management system designed to enforce policyholder acceptance of its new claim system.   Under traditional casualty insurance thinking, insurers were naturally disposed to avoiding litigation whenever possible, because litigation tended to defeat the goals of the fiduciary/indemnity paradigm.   State Farm sees litigation as providing

the best possible venue for achieving the goals of its new system for casualty insurance. Litigation is costly and time consuming. It allows State Farm to fully exploit its overwhelming financial superiority and the policyholder's vulnerability to delay, which is the natural consequence of the casualty loss. Litigation would also provide a means for State Farm to send messages to other policyholders and plaintiff's attorneys about the futility of resistance to the new system.

20. In addition to these company-level procedures, State Farm implemented an insurance company strategy that focused on societal, legislative, and commercial measures which all but ensured the success of the strategy. State Farm implemented a plan to lead a national campaign to attempt to change public policy, abolish or reduce the effectiveness of bad faith statutes, and judicially repeal the common law fiduciary/indemnity paradigm which made it bad faith for casualty insurers to use increased shareholder value or increased claim surpluses as the only legitimate goals of claim handling.

21. State Farm's claim handling protocols, company goals, profit goals and claim handling strategy originates from the doctrine that was created and implemented for State Farm with the assistance of McKinsey. In the case at hand, State Farm implemented McKinsey's claim handling system, Fire ACE, to increase its profits at plaintiff's expense.

### INFORMATION LIKELY TO BE IN THE POSSESSION OF STATE FARM

22. As with all bad faith cases, most of the proof of plaintiff's bad faith claim against State Farm will be uniquely and solely in State Farm's possession. Therefore, because the facts pled in this complaint are peculiarly within the defendant's knowledge, the facts contained in plaintiff's complaint are based on plaintiff's available information and belief. FED. R. CIV. P. 9(b). Such allegations have evidentiary support arising out of the facts of this case, and the plaintiff believes

such allegations will have further evidentiary support after a reasonable opportunity for further discovery from State Farm.

23.    State Farm initiated a program called "Advancing Claims Excellence," or ACE. State Farm was assisted in the implementation of ACE by McKinsey & Company. The purpose of the ACE program was nothing less than to transform State Farm into the most profitable claim service in the industry. The ACE program achieved this goal by artificially reducing claim payments. ACE was the result of a closed file survey conducted by State Farm personnel rather than independent auditors. These closed file surveys purported to identify which claims were overpaid. The closed file survey included a flaw as it did not utilize an established metric for the underpayment of claims. The true motive behind the closed file survey was to identify ways to artificially lower claim payouts in a manner detrimental to State Farm's first- and third-party claimants. In the case at hand, State Farm employed ACE principles to its handling of plaintiff's claim in a manner that maximized shareholder profits and compromised the fair handling of plaintiff's claim.

24.    State Farm ensured its employees would assist in the implementation of ACE by creating incentive programs for claim adjusters and management to reduce average claim payouts, regardless of merit. These artificial goals had, and continue to have, no rational relationship to the actual value of any individual claim, including the plaintiff's claim in this case.

25.    One of the ways in which State Farm achieved lowered claim payments was to adopt an aggressive strategy towards roof damage claims. Following storm damage claims, State Farm implements a policy of standard denial, which requires insurance adjusters to initially deny policyholder claims as a means of gauging the policyholder's willingness to haggle with the insurance company. If the policyholder accepts the denial, then State Farm retains all the money

owed to the policyholder. In essence, State Farm eliminates claims by issuing sweeping denials under the presumption that some policyholders will accept the denial without question. Policyholders who refuse to accept the denial and choose to pursue their claim through litigation, however, face "mad dog defense tactics" that frustrate policyholders' ability to pursue their claims. In addition, because litigating insurance bad faith claims has become so expensive and time consuming, policyholders and attorneys are becoming increasingly unwilling to fight State Farm. Thus, State Farm not only frustrates policyholders' attempts to pursue their claim, but State Farm also sends a message to plaintiff's attorneys that filing suit against State Farm does not constitute an economically viable option. As a result, lawyers who routinely represent plaintiffs in first-party insurance homeowner insurance claims will refuse to represent plaintiffs who have claims against State Farm.

26.    State Farm also routinely withholds "overhead and profit" as part of its scheme to achieve lowered claim payments. "Overhead and profit" is a benefit available to policyholders that provides an additional twenty percent above the amount of the claim to pay for a general contractor to coordinate repairs. State Farm has an obligation to include overhead and profit in the actual cash value payment. State Farm conceals and fails to disclose the availability of the overhead and profit benefit to policyholders. In this case, State Farm wrongfully denied coverage for plaintiff's claim for overhead and profit.

27.    State Farm also creates an environment that encourages independent adjusters to underpay claims. By tracking the average amount paid on claims for each adjuster, State Farm can determine which adjusters are keeping costs down. State Farm therefore rewards independent adjusters by giving them additional business in exchange for minimizing State Farm's indemnity payout on claims. This arrangement creates a conflict of interest between the independent adjusters

and the policyholders and allows the policyholders to detrimentally rely on the independent adjusters' determinations without knowledge of the conflict of interest. In this case, State Farm assigned an inadequately trained adjuster to inspect plaintiff's property and adjust plaintiff's claim. In addition, the adjuster had a State Farm-provided financial incentive to deny all or part of plaintiff's claim.

28. Through implementation of ACE, State Farm develops incentives, such as promotions for keeping costs down, that results in policyholders being paid less than they are owed. ACE creates pressure for profit-making that manifests itself in underpayment of claims. State Farm had actual awareness that ACE would result in underpaying plaintiff's claim. State Farm employs a nationwide scheme to cheat policyholders out of money to which the policyholders are entitled. State Farm has employed the principles and techniques of ACE against plaintiff in this case in a deceptive, fraudulent, oppressive, and malicious manner. In this case, State Farm provided its managers, adjusters and employees who handled plaintiff's claim with a financial incentive to deny all or part of plaintiff's claim.

29. Another component of ACE focused on the rate at which claimants were represented by legal counsel. State Farm's ACE manual directed claim representatives to "realize that the way we approach claimants and develop relationships will significantly alter representation rates and contribute to lower severities." The manual explained that "payment on represented claims is on average five times the size of unrepresented claims." Consequently, State Farm instructs its claim personnel to eliminate or reduce the likelihood that a claimant would hire an attorney.

30. By dissuading claimants from seeking legal counsel, State Farm has been able to prey upon unrepresented claimants' trust and lack of knowledge and to deny or settle claims for a fraction of their value. If a settlement offer is not accepted or the claimant hires an attorney, State

Farm would fully litigate virtually every claim, irrespective of the value of the injuries suffered by the claimant. State Farm thereby seeks to subject claimants to unnecessary and oppressive litigation and expenses, or in other words, "scorched-earth litigation tactics." In the case at hand, State Farm wrongfully denied all or a portion of plaintiff's claim with the expectation that plaintiff would not hire an attorney.

31. State Farm instructs its claim representatives to meet with the claimants' attorneys to emphasize those costs" *i.e.*, "attorney economics" – through threats, intimidation, and strong-arm tactics. State Farm carries out its policies through the active participation of its attorneys. The "Litigation Management" section of the ACE manual segmented, or targeted, certain claims for litigation and trial. One such litigation segment was referred to as "Settle for 'X' or less – default to trial." State Farm's attorneys were required to "increase trial activity in appropriate cases," such as "where settlement could not be reached for the evaluated amount." The reason that State Farm's attorneys are expected to have "more trials" is to "reduce loss payout." State Farm uses incentive compensation programs to encourage its attorneys to try more cases, irrespective of whether such litigation is justified by the facts. In the case at hand, State Farm denied plaintiff's claim as part of its scheme to use litigation costs and "attorney economics" to dissuade plaintiff and any attorney plaintiff would hire from challenging State Farm's claim decision.

32. Any resulting decrease in claim payments resulting from the ACE program does not serve as a reflection of the true value of the defended claims. State Farm's research indicated that claimants' attorneys who brought cases to trial obtained favorable results. State Farm determined, expressly and as a matter of corporate claims handling policy, that litigating claims "appear to lead to better results than negotiating with plaintiff attorneys." Nevertheless, because of State Farm's scorched-earth litigation tactics and the message State Farm sends to attorneys regarding State

Farm's proactive claim defense stance, State Farm correctly predicted that substantially fewer claimant attorneys would bring those insureds' claims to trial. Hence, State Farm would receive a net decrease in claim payouts.

33.    State Farm applied the claim handling principles of ACE across all insurance coverage lines. Specifically, State Farm specifically implemented a version of ACE to govern its handling of homeowner and commercial property insurance claims, "Fire ACE."

34.    State Farm handled plaintiff's claim under the construct, policies, procedures, and goals of the Fire ACE program created by McKinsey & Company and implemented by State Farm.

## STATE FARM'S CLOSED FILE SURVEY

35.    Prior to State Farm's implementation of Fire ACE, McKinsey & Company conducted a preliminary "Closed File Survey" of eleven (11) Market Claims Offices ("MCO's"). Before initiating the survey, McKinsey began with the presumption that State Farm's claim process exhibited "leakage," or the overpayment of policyholder claims. It is worth noting that the McKinsey slides provide no proof or support for this critical assumption. Subsequently, State Farm's senior executives became somewhat uncomfortable with McKinsey's term "leakage," and began to substitute the oxymoronic phrase "fair value" or "fair payment."

36.    McKinsey then segmented claims into homogenous groups based on type of coverage, type of damage, and attorney involvement. Using this segmentation procedure to organize the claim processes that would make up the homeowner portion of Fire ACE, McKinsey classified claims into groups based on common characteristics, which presented the best opportunity for reducing claim payments. McKinsey determined that the evaluation of roof damage claims presented the largest opportunity for reduced claim payouts. McKinsey's closed file survey indicated that "overpayments" occurred in the adjustment of claims when adjusters evaluated

claims based on their professional claim experience according to the individual merits of each claim.

37.    While building Fire ACE, State Farm and McKinsey started with profit goals and then built a claim evaluation system aimed at achieving those goals.  Specifically, McKinsey built State Farm's claim evaluation system around Colossus.  Colossus allowed State Farm to calibrate or "tune" the software program by inputting predetermined claim values which State Farm's adjusters could incorporate into their actual claim evaluations.  In other words, State Farm would predetermine the value of certain claims and then charge its adjusters with matching those values in their actual claim evaluations.  In determining the preset values, State Farm used figures that aligned with its profit goals rather than using evaluations from independent, real-world professionals.  Rather than using real and current market values in its "tuning" of Colossus, State Farm entered its own figures and used those evaluations to set a "new and reduced market value for claims."  State Farm used Colossus in its Fire ACE evaluation of bodily injury claims.  It is the market's role – not State Farm's role - to set market values for claims, and State Farm committed bad faith in attempting to artificially set claim market values and apply those values to plaintiff's claim.

38.    The Fire ACE McKinsey slides are the construction plans for State Farm's "claim payment factory."  They show how McKinsey designed State Farm's claim handling system to underpay homeowner and commercial property insurance claims.  They show how McKinsey designed State Farm's claim factory to produce an inherently defective product that fails to provide insureds with prompt and fair indemnification for their covered losses, thereby endangering our standard of living.  State Farm evaluated the plaintiff's claim using this system and denied the plaintiff's claim for reasons unrelated to the merits of the claim.

39.    State Farm knew that its implementation of Fire ACE would create a significant risk of liability for bad faith claims and punitive damages.  Nevertheless, State Farm analyzed Fire ACE for "balance of risk and reward" and concluded that Fire ACE's rewards would justify any risk. In other words, even if Courts and juries imposed bad faith penalties on the minimal amount of cases that proceeded to trial, Fire ACE would still produce the intended profits because plaintiff's lawyers would overall be reluctant to litigate and take enough cases to trial.  Remember, State Farm devoted a substantial portion of Fire ACE to sending a message to plaintiff's attorneys regarding "attorney economics" and the fact that State Farm would vigorously defend claims without regard to the merits of those claims.

40.    The goals, processes, and procedures of the Fire ACE program have been absorbed into State Farm's overall way of doing business.  State Farm never stopped using Fire ACE in its handling of insurance claims.  State Farm never hired McKinsey or another consulting firm to take on the monumental task of teaching a different claims handling system to its employees, instilling a new claim handling culture, or ensuring the elimination of Fire ACE from State Farm's claim handling culture, goals, and procedures.  The goals, processes, and procedures left over from the Fire ACE program have been used to deny the plaintiff's claim in a deceptive, fraudulent, oppressive, and malicious manner.  In the case at hand, State Farm employed its Fire ACE-based claim system in its handling of plaintiff's claim.  In doing so, State Farm denied or underpaid plaintiff's claim as part of a strategy and scheme to guarantee or increase its surplus and shareholder returns.  To date, State Farm continues to delay in the payment for the damages to the property.  As such, the plaintiff's claim remains unpaid, and the plaintiff was never able to properly repair the property.

## POST-CLAIM UNDERWRITING

41.    Plaintiff alleges that State Farm engaged in fraudulent post-claim underwriting.  At the time that defendant sold the insurance policy to plaintiff, defendant had no intention of performing its duties and honoring the representations it made to plaintiff.  Specially, this representation consisted of defendant's promise to provide full indemnity to plaintiff from financial loss caused by a covered peril, less the policy deductible.  State Farm intentionally under-evaluated the risk associated with the insurance policy in an effort to secure the policy sale and made an attempt to properly evaluate the risk only after plaintiff filed the insurance claim at issue.   In its use of post-claim underwriting, defendant searched for reasons to deny plaintiff's claim by conducting the type of evaluation that it should have conducted before defendant sold the policy to plaintiff and before plaintiff paid insurance premiums to defendant.  Had plaintiff known and understood that defendant would engage in post-claim underwriting before plaintiff agreed to purchase the insurance policy from defendant, the plaintiff would have made an informed decision and purchased coverage from a different insurance company.  Defendant's actions allowed defendant to collect an upfront premium profit while intending to betray its promise of full indemnity.  In the case at hand, defendant's fraudulent post-claim underwriting scheme caused plaintiff to purchase a worthless insurance policy and suffer financial property loss.

42.    State Farm denied or underpaid plaintiff's claim as part of a strategy and scheme to guarantee or increase its surplus and shareholder returns.  To date, State Farm continues to delay in the payment for the damages to the property.  As such, the plaintiff's claim remains unpaid, and the plaintiff was never able to properly repair the property.

## COUNT 1 - BAD FAITH

43. Plaintiff is an insured under an insurance contract issued by State Farm, which gave rise to a duty of good faith and fair dealing.

44. Defendant breached the duty by denying and delaying payment of a covered claim when defendant knew or should have known its liability under the policy was reasonably clear.

45. Defendant also breached the duty by creating and applying a claim handling system that was designed to ensure that the plaintiff's claim was denied without consideration of the merits of the claim.

46. Following its initial inspection, State Farm possessed all information necessary to enable it to make a fair coverage and payment determination on plaintiff's claim. In addition, following its initial inspection, State Farm failed to provide coverage for all the covered damage, including the damage that plaintiff's inspector discovered during his inspection. State Farm failed to honor its obligation to perform a reasonable investigation and issue timely payment to plaintiff.

47. Defendant's breach of duty proximately caused injury to plaintiffs, which resulted in the following damages:

    a.   mental anguish damages; and

    b.   loss of policy benefits.

48. <u>Exemplary damages.</u> Plaintiff suffered injury independent of the loss of policy benefits, and that injury resulted from defendant's gross negligence, malice, or actual fraud, which entitles plaintiff to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).

## COUNT 2 - BREACH OF CONTRACT

49. In addition to other counts, State Farm breached its contract with plaintiff.

50.     Plaintiff and defendant executed a valid and enforceable insurance contract.  The contract stated that defendant would pay the replacement cost of all damage which occurred to plaintiff's property caused by a covered peril, and that plaintiff would pay insurance premiums and perform other obligations as outlined in the insurance policy.

51.     Plaintiff fully performed plaintiff's contractual obligations.

52.     State Farm breached the contract by refusing to pay the full amount of the cost to repair or replace the property.  State Farm failed and refused to pay any of the proceeds of the policy, although due demand was made for proceeds to be paid in an amount sufficient to cover the damaged property and all conditions precedent to recovery upon the policy had been carried out and accomplished by plaintiff.

53.     Plaintiff seeks unliquidated damages within the jurisdictional limits of this court.

54.     <u>Attorney Fees.</u>  Plaintiff is entitled to recover reasonable attorney fees under Texas Civil Practice & Remedies Code chapter 38 because this suit is for breach of a written contract.  Plaintiff retained counsel, who presented plaintiff's claim to State Farm.  State Farm did not tender the amount owed within 30 days of when the claim was presented.

## COUNT 3 – DECEPTIVE INSURANCE PRACTICES

55.     Defendant State Farm failed to explain to plaintiff the reasons for State Farm's offer of an inadequate settlement.  State Farm failed to offer plaintiff adequate compensation without adequate explanation of the basis in the policy for its decision to make less than full payment.  Furthermore, State Farm did not communicate that any future settlements or payments would be forthcoming to pay for the entire losses covered under the policy, nor did they provide any explanation for the failure to adequately settle plaintiff's claim.

56.     State Farm failed to affirm or deny coverage of plaintiff's claim within a reasonable time. Specifically, plaintiff did not receive timely indication of acceptance or rejection, regarding the full and entire claim, in writing from State Farm.

57.     State Farm refused to fully compensate plaintiff under the terms of the policy, even though State Farm failed to conduct a reasonable investigation. State Farm performed an outcome-oriented investigation of the plaintiff's claim which resulted in a biased, unfair, and inadequate evaluation of plaintiff's losses on the property.

58.     State Farm failed to meet its obligations under the Texas Insurance Code regarding its duties to timely acknowledge plaintiff's claim, begin an investigation of plaintiff's claim, and request all information reasonably necessary to investigate plaintiff's claim within the statutorily mandated time of receiving notice of plaintiff's claim.

59.     State Farm failed to accept or deny plaintiff's full and entire claim within the statutorily mandated time of receiving all necessary information. In addition, State Farm failed to communicate with plaintiff to ensure that plaintiff understood the coverage denials they received.

60.     Defendant's acts or practices violated:

a.     Texas Insurance Code chapter 541, subchapter B.

(1)     Misrepresenting to a claimant a material fact or policy provision relating to the coverage at issue. TEX. INS. CODE §541.060(a)(1).

(2)     Not attempting in good faith to bring about a prompt, fair, and equitable settlement of a claim once the insurer's liability becomes reasonably clear. TEX. INS. CODE §541.060(a)(2)(A).

(3)    Not promptly giving a policyholder a reasonable explanation, based on the policy as it relates to the facts or applicable law, for the insurer's denial of a claim or for the offer of a compromise settlement of a claim. TEX. INS. CODE §541.060(a)(3).

(4)    Not affirming or denying coverage within a reasonable time. TEX. INS. CODE §541.060(a)(4)(A).

(5)    Refusing to pay a claim without conducting a reasonable investigation. TEX. INS. CODE §541.060(a)(7).

(6)    Making an untrue statement of material fact. TEX. INS. CODE §541.061(1).

(7)    Leaving out a material fact, so that other statements are rendered misleading. TEX. INS. CODE §541.061(2).

b.    Texas Deceptive Trade Practices Act §17.46(b).

(1)    Representing that an agreement confers or involves rights, remedies, or obligations that it does not, or that are prohibited by law. TEX. BUS. & COM. CODE §17.46(b)(12).

c.    Texas Insurance Code Chapter 541.151.

61.    Defendant's acts and practices were a producing cause of injury to plaintiff which resulted in the following damages:

a.    actual damages; and

b.    insurance policy proceeds.

62.    Plaintiff seeks damages within the jurisdictional limits of this Court.

63.    <u>Additional damages.</u>    Defendant acted knowingly, which entitles plaintiff to recover treble damages under Texas Insurance Code section 541.152(b).

64.    Attorney fees.   Plaintiff is entitled to recover reasonable and necessary attorney fees under Texas Insurance Code section 541.152(a)(1).

### COUNT 4 - LATE PAYMENT OF CLAIMS

65.    Plaintiff is insured under a contract for homeowner's insurance issued by defendant.

66.    Defendant State Farm is a corporation.

67.    Plaintiff suffered a loss covered by the policy and gave proper notice to State Farm of plaintiff's claim.

68.    State Farm is liable for the claim and had a duty to pay the claim in a timely manner.

69.    Defendant breached its duty to pay plaintiff's claim in a timely manner by not timely:

    a.    acknowledging the claim;

    b.    investigating the claim;

    c.    requesting information about the claim;

    d.    paying the claim after wrongfully rejecting it; and

    e.    paying the claim after accepting it.

70.    State Farm's breach of duty caused injury to plaintiffs, which resulted in the following damages:

    a.    mental anguish damages;

    b.    policy proceeds;

    c.    prejudgment interest

71.    Statutory damages.   Plaintiff is entitled to recover actual damages in the amount of the claim, and under Texas Insurance Code section 542.060(c), statutory damages of 10% of the amount of the claim.

72. <u>Attorney fees.</u>  Plaintiff is entitled to recover reasonable attorney fees under Texas Insurance Code section 542.060(b).

**COUNT 5 – COMMON LAW FRAUD**

73. Underwriting is not only a part of insurance; underwriting *is* insurance.  Underwriting is the function of securing and evaluating information and making decisions to accept or reject risks.  The insurance underwriting and claims processes are inextricably linked.  When a loss occurs, the policyholder's payment of that loss has already been collected during the underwriting process.  Insurance can work effectively only if underwriters accept risks that will experience no more than the types and amounts of losses anticipated in rates.  If the underwriters accept risks that experience more losses than anticipated, the rates will be inadequate, and the insurer's solvency might be threatened.

74. Before an insurer sells an insurance policy to a customer, the insurance company underwrites the property to be insured.  When an insurer underwrites a new policy, it records a premium receivable (which is an asset) and a claim obligation (which is a liability).  Hence, the claim handling process begins when the insurance company sells the insurance policy to the insured – not when the anticipated loss occurs.  The liability is considered part of the unpaid losses account, which represents the loss reserve.  Maintaining an adequate level of loss reserves puts an insurance company in a better financial position to pay out claims.

75. Thus, the insurer reserves money to pay a claim in advance of the claim occurrence and during the policy underwriting process.  Specifically, in calculating the premium, the insurance company performs a set of calculations.  First, the insurance company determines the "loss costs.", which make up the primary block of the insurance premium.  Loss costs are the insurer's good faith projection of how much it will pay for claims that arise under the policy during a given policy

period. Loss costs are based on vast actuarial experience and are usually very accurate, being based on the "law of large numbers." Generally, loss costs make up generally about seventy cents ($0.70) of every premium dollar an insured pays for property-casualty coverages.

76. To correctly underwrite any risk and thus properly calculate the loss costs, the insurance company underwriters must secure information about the risk. Every discussion about the underwriting decision to be made on an insurance application must be based on facts that have been secured. One of the major reasons for securing information about each risk concerns the insurance company's avoidance of adverse selection in underwriting a policy. Adverse selection refers to situations in which an insurance company extends coverage to an applicant whose actual risk is substantially higher than the risk known by the insurance company. To minimize the risk of adverse selection, the insurance company must obtain information regarding the physical condition of the buildings it contemplates insuring. Thus, property inspections are critical in the underwriting workflow. These inspections are often used to verify the insured not only exists at the address on the policy and there are no liability or other hazards that exist on the property that could cause the property owner and/or the insurance company unnecessary exposure. These inspections are used as an underwriting tool to minimize the potential of an insurance claim and to verify that the information collected at the time of application for the policy is correct. State Farm failed to conduct an underwriting inspection and failed to property underwrite the insurance policy.

77. State Farm could not provide its insurance services unless it was able to make a legitimate profit sufficient to allow it to remain solvent and provide a reasonable return to its shareholders. The premium that State Farm required plaintiff to pay for the insurance policy was calculated to allow State Farm to accomplish those goals.

78.    State Farm charges its policyholders about seventy cents ($0.70) out of every premium dollar to pay all the claims that will arise during the policy period.  Expenses and overhead account for an additional twenty-five cents ($0.25) of each premium dollar, with the remaining five cents ($0.05) being allocated for State Farm's profit.  In addition, State Farm's profits include not only the final five cents ($0.05) of the premium dollar but also the investment value on the entire premium dollar during the time between when the premiums are collected and when the claims are finally paid (on average about ten cents ($0.10) per dollar) making the real profit about fifteen cents ($0.15) for each premium dollar.

79.    State Farm made the material representation to plaintiff that State Farm would pay the full cost of casualty losses, less the policy deductible, that plaintiff suffered in a covered event.  This representation was false.  When State Farm made this representation, State Farm knew that State Farm had not underwritten the policy correctly.  The McKinsey program dictated that State Farm focus on marketing, collecting premiums, and building a litigation program to vigorously fight policyholders who attempted to challenge State Farm's claim decisions.  State Farm did not underwrite the policy with the intent of paying the full value of future claims.  Just the opposite – State Farm underwrote the policy knowing that the McKinsey's Fire ACE system would enable it to enforce its predetermined claim values without regard to the true value of a policyholder claim.  In other words, because State Farm's McKinsey program predetermined policyholder claim values, it was unnecessary for State Farm's actuaries to predict the value of future claims through the underwriting process.

80.    When State Farm sold plaintiff the insurance policy, State Farm promised to pay the full value of future covered claims.  State Farm knew that it had no intention of paying the full value of policyholder claims, and that State Farm would only pay the predetermined claim value

calculated via the McKinsey method without regard to the actual value of the sustained loss.  State Farm knew that, if plaintiff challenged the claim decision, State Farm would implement its litigation plan to force plaintiff to accept State Farm's predetermined claim value.  State Farm made this representation with the intent that the plaintiff act on it.  State Farm knew that the plaintiff was seeking peace of mind, and State Farm made the representation knowing that plaintiff would act on it.  The plaintiff purchased the policy, paid all premiums, in reliance on the representation and with the expectation that State Farm would keep its promise.  The representation caused injury to plaintiff.

81.    The McKinsey program dictated that State Farm give plaintiff a choice: Accept a settlement now for a fraction of the true cost of plaintiff's damage or expect to spend several years in grueling litigation.  McKinsey predicted that ninety percent (90%) of claimants would be forced to capitulate because the claimants would need the money in a prompt settlement.  The plaintiff gave State Farm money for something that the plaintiff could never receive.  State Farm sold uncollectible insurance to the plaintiff.  With one hand, State Farm sold the plaintiff an insurance policy and promised to protect the plaintiff from financial harm.  With the other hand, State Farm used the McKinsey program as a hammer to destroy the protection that State Farm promised to provide.

82.    State Farm lied when it informed plaintiff that the policy did not cover all of plaintiff's damages.  State Farm's motivation in telling this lie was to properly execute the McKinsey strategy and thus allocate the entire policy premium to profit.  State Farm told this lie to further the original fraud – the selling of an insurance policy to plaintiff that State Farm knew would not function as promised.

83.     State Farm's fraudulent actions caused injury to plaintiff, which resulted in the following damages:

     a.    actual damages;

     b.    exemplary damages; and

     c.    prejudgment interest

### COUNT 6 – FRAUD BY NONDISCLOSURE

84.     Plaintiff incorporates into this count the allegations contained in paragraphs 73 through 83.  The ACE program would govern any claim filed by plaintiff under the policy.  As previously described, the purpose of the ACE program was to increase corporate profits at plaintiff's expense should plaintiff ever file a claim under the policy.  State Farm concealed this fact from plaintiff and failed to disclose the facts about the ACE program to plaintiff.  Because the operation of the ACE program directly contradicted the promises that State Farm made to the plaintiffs, State Farm had a duty to disclose these material facts to plaintiff. The defendant knew the plaintiff was ignorant of the facts and that the plaintiff did not have an equal opportunity to discover the facts.  State Farm was deliberately silent when it had a duty to speak.  By failing to disclose the facts, the defendant intended to induce the plaintiff to purchase the insurance policy.  Plaintiff purchased the policy and thus relied on State Farm's nondisclosure.  Plaintiff was injured when plaintiff acted without the knowledge of the undisclosed facts.

85.     State Farm's fraudulent actions caused injury to plaintiffs, which resulted in the following damages:

     a.    actual damages;

     b.    exemplary damages; and

     c.    prejudgment interest.

86.    Plaintiff incorporates into this count the allegations contained in paragraphs 73 through 83.  Prior to selling the insurance policy at issue in this lawsuit to plaintiffs, State Farm created a claims handling program that would govern the handling of any claim that plaintiff would file under the policy.  State Farm hired McKinsey & Company to redesign the system State Farm uses to handle insurance claims. McKinsey named the project "Achieving Claims Excellence," or "ACE."

87.    ACE had the following stated goals:

    a.    Fuel Growth

    b.    Improve Shareholder Returns

    c.    Expand opportunities and quality of life for employees; and

    d.    Improve State Farm's standing with claimants and customers.

88.     State Farm conducted a "Closed File Review," or "CFR" to identify areas in which the dollar amount of customer claim payments could be reduced.  The CFR identified and addressed alleged instances of claim "overpayments."   However, the CFR did not attempt to measure instances in which State Farm underpaid claims.

    a.    Following State Farm's closed file review of homeowner claims, State Farm determined that its largest opportunity to reduce claim payments existed in State Farm's evaluation of roof damage claims.

89.    Using a reverse-engineering process, State Farm sought to use ACE to establish a new and reduced fair market value for property damage claims.

    a.    State Farm first created cost reduction and earnings per share goals and objectives that it wanted to accomplish through its use of ACE.

b.      State Farm then conducted the Closed File Review to find opportunities to reduce claim values.

c.      State Farm then implemented the use of claim adjusting software which State Farm could calibrate or "tune" to produce outputs in line with State Farm's financial goals and that produced the sought after reduced claim values.

d.      Furthermore, because claim values increased when State Farm allowed its claim adjusters to handle claims using their professional judgment and experience, State Farm removed the professional judgment of its adjusters in the handling of homeowner and other claims through State Farm's implementation of ACE.

e.      State Farm also employed employee compensation incentives to encourage its employees to embrace ACE procedures.

f.      McKinsey's formulation of ACE did not include input from the market of actual contractors who would be responsible for performing the repairs and services associated the damage claims that State Farm would handle.

g.      State Farm predetermined that the average claim settlement should be the amount established through its artificial evaluation process.

90.     McKinsey then created a method through which State Farm could use the American judicial system as the main driver in ACE's efforts to enforce acceptance of State Farm's claim values.

a.      State Farm considers the insurance claims process as a "Zero Sum Game" in which someone must lose so that State Farm can "win."

b.      State Farm's stated goal, through its use of ACE, was to "win by exploiting the economics of the practice of law."

c.     State Farm's stated goal, through its use of ACE, was to "redefine the game," "change the rules and play a new game," and to achieve "zero-sum game results."

d.     Pursuant to ACE principles, State Farm used "alligator" claim representatives to handle customer claims.

e.     ACE directed State Farm's adjusters to adhere to State Farm's artificially created market values and to use litigation to maintain those values.

f.     ACE directed State Farm employees to implement a "From Good Hands to Boxing Gloves" strategy to enforce acceptance of its claim values.  Policyholders who accepted State Farm's ACE evaluated claim values would receive "Good Hands" treatment.  Policyholders who demanded fair payment and refused to accept State Farm's ACE evaluated claim values would receive "Boxing Gloves" treatment.

g.     "Boxing Gloves" treatment consisted of "take it or leave it" negotiating stands designed to deliberately provoke "significantly higher levels of litigation" over claims.

h.     State Farm employed "alligator" adjusters to prevent aggrieved policyholders from obtaining claim compensation the policyholders felt they justly deserved.

i.     State Farm intentionally used the American judicial system as a tool to enforce the claim values it artificially created that had no relation to the actual value of policyholder claims.

j.     To motivate employees to embrace ACE, State Farm created aggressive employee performance goals and tied employee compensation to those goals.

91.   Through its use of ACE, State Farm implemented measures to improve State Farm's standing with its customers and to increase customer satisfaction, but not in the most obvious manner that one would expect.

a. State Farm's key to successful implementation of ACE was to reduce or eliminate claimant attorney involvement in claims. ACE sought to reduce attorney representation by having its claims representatives make early contact, display empathy, establish rapport with claimants, and to make promises of fair treatment to insured. Ensuring that claimants were satisfied with the amount of compensation they received for property damages was not part of State Farm's plan to achieve customer satisfaction.

b. ACE sought to shift advantage away from claimants and plaintiff attorneys.

c. ACE's success depended on State Farm's efforts to change public policy, advocate for tort reform, modify bad faith laws, and improve procedural rules regarding discovery in litigation.

d. ACE expressly advanced the notion that claimants would be better off without attorney representation, even though State Farm's and McKinsey's own research showed that represented claimants received higher net settlements despite attorney fees.

92. ACE intentionally restricted State Farm's claim performance measurements to those activities required for State Farm to achieve its desired claim evaluation and earnings per share outcomes.

93. State Farm handled plaintiff's claim under the policies, procedures, and goals of the ACE program created by McKinsey & Company and implemented by State Farm. State Farm, via ACE, defined the payout the plaintiff would receive from their claim before the policy was sold and before the covered loss even occurred. Prior to selling the insurance policy to plaintiffs, State Farm determined that plaintiff would not be allowed to receive payment on any covered claim plaintiff would file under the policy. State Farm sold uncollectible insurance to plaintiff. Uncollectible insurance is not insurance. If plaintiff had known that such a program would have governed any

claim plaintiff would file under the policy, then plaintiff would not have purchased the insurance policy from State Farm.

94. State Farm's fraudulent actions caused injury to plaintiffs, which resulted in the following damages:

    a.    Premium payments;

    b.    exemplary damages; and

    c.    prejudgment interest.

### THE WHO, WHAT, WHEN, AND WHERE

95. In support of the elements of common law fraud and fraudulent nondisclosure, plaintiff alleges the following:

    a.    **THE WHO:**    Paul Smith and Phillip Hawkins

    b.    **THE WHAT:**    Smith and Hawkins represented that State Farm would pay the full cost of all covered losses, less the policy's deductible. Smith and Hawkins made this representation in writing in the insurance policy that State Farm sold plaintiff.

    c.    **THE WHEN:**    Policy Inception

    d.    **THE WHERE:**    McAllen, Texas

### JURY DEMAND

96. Plaintiff respectfully requests a trial by jury.

### CONDITIONS PRECEDENT

97. All conditions precedent to plaintiff's claims for relief have been performed or have occurred.

### PRAYER

98. For these reasons, plaintiff asks that plaintiff be awarded a judgment against defendant for the following:

a.   Actual damages.

b.   Prejudgment and postjudgment interest.

c.   Consequential damages.

d.   Court costs.

e.   Attorneys' fees.

f.   Treble damages.

g.   Exemplary damages.

h.   All other relief to which plaintiff are entitled

Respectfully submitted,

GULF COAST INSURANCE LAWYERS, P.C.
3233 West Dallas Street, Suite 2101
Houston, Texas 77019
Telephone: (713) 941-9309
Facsimile: (844) 270-0740

DANNY RAY SCOTT
State Bar No. 24010920
danny@gulfcoastinsurancelawyers.com
HALIMATOU BAH
State Bar No. 24130178
hbah@gulfcoastinsurancelawyers.com

*Attorneys for Plaintiffs*